**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-06-380 (4) |
| | § | C.A. No. C-10-56 |
| RUDY GUTIERREZ, | § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE**

Pending before the Court is Movant Rudy Gutierrez' ("Movant") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  (D.E. 47.)[1]  The Court ordered the government to respond and, following an extension of time, the government filed its response and motion to deny relief.  (D.E. 388).  Movant has filed a reply to the government's response.  (D.E. 389).

For the reasons stated herein, Movant's § 2255 motion is denied.

**I.  JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

---

[1]  Docket entry references are to Movant's criminal case, C-06-cr-380(4).

1

## II.  FACTS AND PROCEEDINGS

**A.      Procedural Background.**

In a two count superseding indictment filed on April 11, 2007, Movant was charged in count 1 with knowingly and intentionally conspiring to distribute more than five kilograms of cocaine and more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).   (See D.E. 149).  In count 2, Movant was charged with conspiring with his brother, Leonel Martin Gutierrez ("Martin"), to launder funds that involved the proceeds from the distribution of controlled substances, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h).  Id.

Movant pled not guilty, and on June 5, 2007, the case proceeded to trial before a jury. On June 6, 2007, the jury returned its verdict finding Movant guilty of conspiring to distribute more than 1,000 kilograms of marijuana, and guilty of money laundering.[2]  (D.E. 195).  On August 9, 2007, the final presentence investigation report (PSR) was filed.  (D.E. 214).  Movant did not file objections to the PSR.

On November 26, 2007, the Court sentenced Movant on count 1 to 360 months in the Bureau of Prisons (BOP) and a ten-year supervised released term, and on count 2, to 240 months in the BOP and a 3-year supervised release term, with the sentences to run concurrently.  (D.E. 239).

---

[2] The jury did not find Movant guilty of distributing cocaine.

Movant appealed alleging that there was insufficient evidence to convict him on either conspiracy count.  (D.E. 242).  In addition, he argued that the testimony of Carlos Martinez, a non-indicted coconspirator, was improperly admitted because Martinez was represented by Amador Garcia, the same attorney who initially represented Movant for some 16 days when Movant was arraigned in this case.  Id.  The Fifth Circuit rejected Movant's arguments and affirmed his conviction.  (D.E. 332).  The Supreme Court denied his petition for writ of certiorari.  (D.E. 351).

**B.       Background facts concerning criminal charges.[3]**

Movant was a participant in a family drug trafficking organization ("DTO") that distributed cocaine and marijuana from November 2003 through February 2007.  (PSR at ¶ 4).  In addition to Movant, the DTO included: Movant's brother, Martin; his sister-in-law, Ruby Rivera-Gutierrez (Martin's wife); his uncle, Jose Gutierrez, Jr.; and his cousins, Barney Joe a/k/a Bernardo Jose Gutierrez and Catarino Gutierrez, Jr.  Id.  The family established a trucking business, "G Trucking," for the purpose of transporting drugs.  Id.  The base of operations for the DTO was a ranch owned by Martin and Ruby in Weslaco, Texas.  Id.  The ranch had a warehouse where the drugs were packaged and then loaded onto tractor trailers.  Id.  The drugs were secreted in legitimate loads of produce.  Id.  The ranch was guarded by armed security.  Id.

---

[3] The facts of the case are taken from either the presentence investigation report (PSR) (D.E. 214) to which no objections were filed, or to the trial transcript (Tr and Tr-2). (D.E. 230, 231).

Martin was the main leader of the DTO, while Movant was the main narcotics smuggler and money launderer.  (PSR at ¶ 5).  Ruby was in charge of the legitimate end of the trucking business that was established as a cover for the drugs operations. Id.  Barney Joe transported drug proceeds and narcotics, and Catarino  laundered money and helped recruit other drivers.  Id.  The majority of the drugs were transported to Memphis, Tennessee, although some deliveries went to Arkansas, and there were some trips to New York.  (PSR ¶ 4).

In May 2006, a search warrant was executed on the ranch.  Ruby was arrested at that time, and she has remained incarcerated ever since.  (Tr 34-35, 41).  On November 9, 2006, Movant was arrested on a federal warrant.  (PSR ¶ 3).  On February 7, 2007, Martin was arrested.  Id. at ¶ 46.

On June 14, 2006, the government filed a superceding indictment charging that Movant had conspired to intentionally possess with intent to distribute cocaine and marijuana, along with his five family members: his brother Martin; his sister-in-law Ruby; his uncle Jose; and his two cousins, Barney Joe and Catarino.  (D.E. 57).

On April 11, 2007, the government filed a second superseding indictment.  (D.E. 149).  In this indictment, Ruby and Jose were omitted from the conspiracy charge, having entered a plea agreement with the government in each of their cases.  (See 2:06cr380 (3) (Ruby), at D.E. 78; and 2:06cr380 (1) (Jose), at D.E. 81.  Movant was charged with conspiracy to possess cocaine and marijuana along with his brother and two cousins.  (D.E. 149).  In

addition, in a second count, Movant was charged, along with his brother, of money laundering.  Id.

### C.    Movant's trial.

On June 5 - 6, 2007, Movant went to trial.  The government's first witness was Ruby Rivera-Gutierrez, Movant's sister-in-law.  (Tr 10 – 82).  Ruby testified that she married Martin in 2003.  (Tr 12).  Before she married him, she had been convicted of a drug trafficking offense in Alabama, and had served time in federal prison.  Id.

Ruby acknowledged that she continued to engage in drug trafficking, leading to the charges in the instant case. (Tr 13).  She entered into a plea agreement with the government, and she hoped to receive a reduction in her sentence by testifying at Movant's trial.  Id.

Originally, Ruby lived in Edinburg, Texas.  (Tr 15).  Martin lived in a trailer on property in Weslaco, along with Movant, and Martin was building a house on the property. (Tr 16-17).  The property also had a warehouse on it. (Tr 17).  It was Ruby's understanding that the house was paid for with drug money. (Tr 18).  Martin operated the drug trafficking operation with Movant.  Id.  "It was pretty much a family organization, all the cousins and uncles."  Id.

Ruby testified that, prior to her moving to Weslaco, Movant was in federal prison in Three Rivers, and then he transferred to a halfway house in Brownsville, Texas.  (Tr 18-19). She and Martin picked up Movant when he was released from prison and drove him to the halfway house. (Tr 19).  Rudy owned a home in Weslaco before his first incarceration.  (Tr

5

20).  When he completed the halfway house program, he moved back to his Weslaco home at 11 Mile Lane.  Id.

The family operated a trucking business known as "G Trucking."  (Tr 14-15, 21-22).  G Trucking "was a legitimate business but it was more of a front for, to move drugs."  (Tr 21).  The main purpose of the business was to move drugs, specifically, cocaine and marijuana.  Id.

Ruby was in charge of booking the legitimate loads.  (Tr 22).  She would call brokers and get loads from them.  Id.  A driver would then, for example, pick up five or six pallets of produce, return to the warehouse and have drugs loaded on it, then go to another location to pick up another five or six pallets of a legitimate load, and then the truck would be ready to travel.  (Tr 22-23).  Having the drugs packed in the middle between legitimate loads helped conceal the drugs.  (Tr 23).  Ruby had to coordinate the timing of legitimate load pick-ups with packing the drugs.  (Tr 24).  She would not inform drivers about the drugs, but she believed the drivers had agreements with Martin.  (Tr 25).  Ruby testified further that Jose Gutierrez, Martin's uncle, and Barney Joe Gutierrez, Martin's cousin, were co-conspirators with her, and each individual had a role in the conspiracy.  Id.

Most of the loads were destined to Memphis, Tennessee because they had connections there to distribute the drugs.  (Tr 27).  Martin and Movant had separate drug transactions, and their drugs would be packaged differently to tell them apart, although they would usually be loaded in the same tractor-trailer.  (Tr 27-28).  For example, Movant's drugs would be wrapped in black shrink wrap, and Martin's wrapped in red.  (Tr 28).  Martin and Movant

6

worked together because their goal was to move the drugs from Weslaco to Tennessee.  (Tr 29).  The drugs came from Mexico.  (Tr 30).  Someone would contract with G Trucking to transport the drugs.  (Tr 30).  Ruby did not know where the drugs went after they reached Memphis. (Tr 31).  A "significant profit" was made from transporting the drugs.  (Tr 31-32).

In the summer of 2004, task force agent Scott O'Neal contact Ruby and questioned her about the trucking business.  (Tr 33).  Ruby denied knowledge of any drugs in the tractor-trailers that had been stopped at a Border Patrol checkpoint.[4]  Id.  They continued to transport drugs even after trucks were seized. (Tr 35).

Ruby testified that Movant would engage in drug trafficking transactions at her home and on the ranch property.  (Tr 36).  She would let people in and out of the property by controlling an electric gate.  (Tr 37).  In addition, Martin told her what was going on.  Id

After delivering the drugs, drivers might stay for a week in Memphis to collect money from the buyers.  (Tr 45).  The drivers would drive back to Texas and give the money to Ruby.  Id.  In addition, money up to $990.00 could be wired without identification via Western Union.  Id.  Ruby would put the money into the company's account.  Id.

Hector Medelez, Jr. testified that, in November 2003, he was contacted by Jose Gutierrez to transport produce for Martin from the Valley to Memphis.  (Tr 86).  Medelez knew marijuana was loaded in the trailer.  (Tr 86).  He was supposed to get paid $100.00 per

---

[4] Tractor-trailers belonging to G Trucking were seized at both the Sarita and Falfurrias checkpoints.

pound to transport the marijuana.  (Tr 87).  He was stopped and arrested by a DTPS trooper.

(Tr 88).  He was released on bond nine days later, and he went home to the Valley.  Id.

In July 2004, Meledez was arrested at the checkpoint.  (Tr 89).  He had again been

hired by Jose Gutierrez and he was transporting a legitimate load of barrels, but also, 1,980

pounds of marijuana.  (Tr 90).  Meledez pled guilty and is in federal prison.  (Tr 91).  He

testified that he was cooperating with the government in hopes of getting a reduced sentence.

Id.  Meledez testified that he did not know Movant and had not dealt with him.  (Tr 92-93).

Carlos Domingo Martinez testified that, on March 15, 2004, he was arrested at the

Sarita Border Patrol checkpoint.  (Tr 96).  He was hired to transport marijuana,  (Tr 98), and

he was arrested with 1,080 pounds.  (Tr 99).  He spoke mostly to Martin Gutierrez.  (Tr 100).

He talked to Movant, but "not many occasions".  Id.  Martinez could not recall exactly where

he first met the Gutierrez brothers, but he thought he met Martin at a bar.  (Tr 101).  In

January 2004, he transported 1,000 pounds through the checkpoint and to Memphis.  (Tr

102).  Martin paid him some money.  (Tr 103).  Sometime after making the January 2004

delivery, Martinez spoke to Martin outside of the warehouse about receiving the rest of his

pay.  (Tr 104-05).  Martin asked if he would deliver another load and indicated that the

delivery would be for both him and Movant.  (Tr 105).  Martinez and Martin then approached

Movant at the ranch, and Movant confirmed that part of the next load would be for him.  (Tr

111).  In fact, Movant assured Martinez that he would be paid this time.  (Tr 112).  On the

day the marijuana was loaded, Martinez backed the trailer up into the warehouse for loading,

and left.  (Tr 112-13).  Martin was the only person there.  (Tr 113).

8

Roel Manuel Saenz testified that he grew up in the same area as the Gutierrez family. (Tr 118).  He lost his job and called Martin regarding work.  Id.  Martin offered him a job hauling produce, and Saenz specified that he wanted legitimate loads only.  (Tr 118). He began driving in March of 2004.  Id.  Ruby hired him, and the paperwork indicated that the tractor-trailer belonged to Martin.  (Tr 119).  Saenz believed the truck belonged to G Trucking.  Id.  He met with Martin and Catarino in Memphis and understood that he was to drive a truck with a duffel bag of money back to the Valley.  (Tr 120).  Saenz believed it was "drug money" because "[t]hey've been locked up like twice for smuggling."  Id.  He testified:

> No, I mean when I worked, when I'd go after a load, I mean there was a lot of paraphernalia, sometimes Martin or Rudy would give me a sack of weed, like about two ounces, quarter of a pound, just for smoking purposes, so I mean it was nothing new they did stuff like that.

(Tr 120).

Saenz testified that he had observed Movant on the ranch at times he was there and had at least one conversation with him.  (Tr 122).

On July 1, 2004, an officer with the Northeast Texas Task Force stopped Saenz for traffic violations.  (PSR ¶ 17).  A search of the vehicle resulted in the seizure of a small amount of cocaine and $172,320.00 in U.S. currency.  Id.  Saenz pled guilty to money laundering in connection with his role transporting money for the Gutierrez family.  (Tr 121). On cross-examination, Saenz testified that the money he was hauling on July 1, 2004 did not belong to Movant.  (Tr 126).

On September 18, 2004, Gregory Osewalt was arrested at the Falfurrias Border Patrol checkpoint for possessing twenty-five bundles of cocaine with an estimated value of $2,201,600.00.  (PSR ¶ 33).  Osewalt lived in Memphis, and a neighbor, Alfonso Morales, introduced him to Movant, and referred to Movant as "the boss." (Tr 132-33).  Osewalt met Movant in Memphis, and thereafter, he drove him around "quite often," like a chauffeur. (Tr 134).  He also collected cash from drugs for Movant.  Id.  Osewalt was also involved in the loading and unloading of drugs.  (Tr 135).  Osewalt testified that Movant owned a trailer in Arkansas, outside of Memphis, and on two occasions, Osewalt unloaded marijuana, between 500 to 1,000 pounds per load, with Movant.  Id.  He and Movant would place the drugs in vans or trucks, and then drive the drugs into Memphis.  Id.  Osewalt traveled to the Valley on four or five occasions.  (Tr 137).  One time, he and Movant rode together and pulled a Cadillac part of the trip.  (Tr 136).

Martin was the individual who actually hired him to transport drugs.  (Tr 138).  The cocaine he was transporting when he was arrested belonged to Martin only.  (Tr 139).

Movant's uncle, Jose Gutierrez, Jr., testified that he was arrested on May 6, 2006 at the Sarita Border Patrol checkpoint with 5,590 kilograms of marijuana.  (Tr 161-62, 165). The load was almost 6,000 kilograms, but neither Movant nor Martin had anything to do with that load.  (Tr 165).

In November 2003, Jose introduced Hector Medelez to Martin for purposes of driving a shipment of produce and drugs.  (Tr 167).  Movant was in prison at that time.  Id.  Jose

testified that he initially went to school with both Martin and Movant while they were growing up, and that they have all kept in touch over the years. (Tr 164).

Sometime after Medelez was arrested in November 2003, Jose saw Movant at the ranch. (Tr 168). He, Martin, and Movant would drink, cook out, and sometimes load trucks. Id. "It was like a hangout place." (Tr 168). Jose started G Trucking as a business to run drugs. (Tr 168-69). Jose sold the business to Movant, and Movant sold it to Martin. Id. Jose testified that he knew Movant sold it to Martin because Movant was in prison, so Martin "took over the company and he was running the trucks." Id.

From the government's exhibits, Jose identified boxes in where "we hid the marijuana." (Tr 171). He, Movant and Martin tried to obtain containers similar to what the legitimate load was packed in, but that was not always possible. Id. Jose testified that, concerning the July 10, 2004 load driven by Medelez, he specifically remembered that Movant was involved in that transaction because they had a difficult time getting containers for that shipment, and also, because Meledez got caught. (Tr 172). Movant was present at the time the marijuana was loaded for Meledez' trip. (Tr 172).

Jose identified Movant's voice on a recording in which Movant eluded to Meledez' arrest at he checkpoint. (Tr 175-77). Originally, Jose had been scheduled to transport the load that Meledez ended up taking. (Tr 178).

Jose confirmed that most of the drugs transported went to Memphis. (Tr 179). Jose was aware of the July 1, 2004 trip in which Roel Saenz got arrested with drug money. Id.

Jose was also aware of the September 18, 2004 load of cocaine transported by Osewalt that was seized. Id.

Jose testified that Movant and Martin "had a conflict all the time," and competed with one another. (Tr 180). He transported for both of them at the beginning, but stopped transporting for Martin because he never paid. (Tr 180-81). Movant did pay when Jose transported drugs for him. (Tr 181).

In April 2005, Jose agreed to transport a load of drugs for Movant and another individual named Mandio. (Tr 182-185). Jose was supposed to meet Movant at the Flying J Truck Stop in Edinburg, and to pick up the keys and the truck there. Id. When he arrived, however, he saw that the Edinburg police had seized the truck and over 1,100 pounds of marijuana. Id. Jose did not get arrested at that time. (Tr 185).

Barney Joe Gutierrez is from Weslaco, Texas and is a cousin of Movant and Martin. (Tr 196-198). At the time of Movant's trial, Barney Joe was in federal custody, having pled guilty to conspiring to possess with intent to distribute marijuana and cocaine as a co-defendant in this action. (Tr 197). He was hoping to receive a reduced sentence for his cooperation with the government. Id.

Barney Joe grew up with Movant and Martin, and he got involved with drug trafficking when he was young. (Tr 198). He would do the packaging, loading, and "counter-surveillance." Id. Barney Joe knew Meledez and testified that Meledez was a driver for Martin. (Tr 199). In observing Government Exhibit 10, Barney Joe testified that some of the bundles of drugs were Martins, and the smaller bundles belonged to Jose. (Tr

12

200).  The drugs came from Mexico, and he wrapped some of the drugs in black saran wrap, and some in clear.  (Tr 200-01).  They wrap the drugs in additional wrap for identification, and to help mask the odor.  Id.  They used industrial size rolls of saran wrap.  (Tr 202).

Barney Joe would go to the warehouse at the ranch about 5 times a week, off and on. (Tr 202).  He visited Movant when Movant was in prison.  (Tr 204).  He began working for Movant about 8 to 10 months after Movant was released from the halfway house.  (Tr 205). He would bring money down from Tennessee.  Id.  For one delivery, he and Movant went to buy barrels to transport the marijuana to match the legitimate load of lime oil.  (Tr 207). They did not find barrels, and therefore, they loaded the marijuana in boxes. (Tr 208). Movant paid Barney Joe to have the tractor-trailer purchased in his name, and this was the tractor-trailer that was confiscated at the Flying J Truck Stop.  (Tr 209).

Agent Scott O'Neal is a member of the DEA task force.  (Tr 226).  Agent O'Neal testified that, in the summer through the fall of 2004, the task force was investigating members of the Gutierrez family.  (Tr 230).  The November 23, 2003 seizure (Meledez, driver) and March 14, 2004 seizure (Martinez, driver), were relevant to the investigation.  Id. The task force conducted surveillance of all the residences where the Gutierrezes resided, including Movant.  (Tr 231).

In May 2006, Agent O'Neal participated in a search of the ranch.  (Tr 232).  The task force found a forklift for loading drugs, saran wrap, a digital scale, and a handgun.  (Tr 234-35).  Law enforcement looked for Movant, but were unable to find him.  (Tr 236).

The government called Martin Gutierrez as a witness, outside the presence of the jury, but he elected to take the Fifth Amendment and not testify.  (Tr-2 at 6 – 12).

Deputy U.S. Marshal Stephanie Creasy was assigned to the DEA task force in Western, Tennessee.  (Tr-2, 18-19).   In late 2005, she was contacted by Agent O'Neal concerning Movant and Martin.  (Tr 19).  O'Neal indicated that his investigation revealed Movant and Martin had ties to Memphis, and he asked Deputy Creasy to take pictures of suspected stash houses, to run licenses, and perform other base checks.  (Tr 21).  Deputy Creasy stated that Memphis is a distribution hub with a number of stash houses to store transported drugs.  Id.

Agent O'Neal discovered an address of a house in Memphis during his investigation of Movant and Martin, and he asked Deputy Creasy to do some surveillance work of the house and talk to a few neighbors.  (Tr-2, 24-25).  By the time Memphis authorities got a search warrant, the house was empty, but the drug-detecting canine alerted to numerous areas throughout the house.  (Tr-2, 25-26).  Deputy Creasy sent O'Neal paperwork linking Movant to the property.  Id. at 26.  Later, Agent O'Neal sent information regarding a trailer in Heth, Arkansas. ( Tr-2,  27).  Creasy and other DEA agents conducted surveillance and observed a tractor-trailer rig pull in, and a Hispanic male get out of the truck, but the driver did not match Movant or Martin's physical description. ( Tr-2, 28).  Shortly thereafter, there was no further activity at that house.  Id.  They entered the house and discovered "a strong smell of marijuana," as well as a Texas license plate, and a bill in the name of "Domingo Mesa." (Tr-2, 29).

After Heth, Deputy Creasy interviewed people about the whereabout of Movant and Martin, and Barney Joe.  ( Tr-2, 30).  An informant told authorities about a house at 855 Restbrook, and when they first went by it, they observed a gold sport utility vehicle. ( Tr-2, 32).  Both Movant and Martin had been linked to that type of vehicle.  Id.  In addition, a van and a white Chevy truck were at the address.  ( Tr-2, 33).  Deputy Creasy knocked on the door and announced "police."  Id.  A small Hispanic male answered the door, and  Movant and a white male named Jeffery Bardwell were discovered in the house.  ( Tr-2, 34).  A search of the house revealed a large duffel bag with approximately 34 pounds of marijuana in it.  ( Tr-2, 35-36).  In addition, Deputy Creasy found an Arkansas ID with the name "Domingo Mesa" on it, with a picture of Movant.  ( Tr-2, 37).  The task force also found a small bag of marijuana, a digital scale, and a heat sealer that is commonly used by drug dealers to seal money to prevent drug dogs from smelling it. ( Tr-2, 38-39, 47).  The agents also found documentation indicated that the white Chevy truck had been insured under the name "Domingo Mesa."  ( Tr-2, 47).

When questioned by Deputy Creasy, Movant stated that he did not know who owned the house; however, he identified the 34 pounds of marijuana and admitted it belonged to him. ( Tr-2, 49).

### III.  MOVANT'S ALLEGATIONS

In his § 2255 motion, Movant lists three grounds for relief.  In his first ground, he argues that he received ineffective assistance of trial counsel because his attorney failed to object to Amador Garcia's subsequently representation of Carlos Martinez, an unindicted co-

conspirator, after first representing Movant for 16 days, including his initial arraignment.  In his second ground for relief, Movant argues that, despite the Court's instruction to the contrary, the jury revealed its numerical division to the Court during deliberations, yet his trial counsel failed to object and/or move for a mistrial.  Finally, Movant raises a <u>Santos</u> challenge that the jury was not properly instructed as to criminal profits, and erroneously convicted him based on a theory of criminal receipts.[5]

## IV. DISCUSSION

### A.    28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; <u>United States v. Placente</u>, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  <u>United States v. Ramos</u>, 955 F.2d 367, 368 (5th Cir. 1992).  "[A] collateral challenge may not do service for an appeal."  <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982).

### B.    Analysis of claims.

---

[5]<u>United States v. Santos</u>, 533 U.S. 507 (2008).

16

1.      **Ineffective assistance of counsel.**

In his first two grounds for relief, Movant argues that his conviction should be vacated because he did not receive the effective assistance of counsel guaranteed by the Sixth Amendment.

Generally, an ineffective assistance of counsel allegation presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984).  United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial.  Id.  This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence.  United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).  If the movant fails to prove one prong, it is not necessary to analyze the other.  Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

Movant argues that, because he is alleging a conflict of interest, the two-prong Strickland analysis does not apply, and that he need only demonstrate that the conflict of interest adversely affected counsel's performance, and prejudice is presumed.  (See D.E. 375 at 15, D.E. 389).  Indeed, if there was an "actual" conflict of interest between Movant and

his counsel, then the standard in <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980), would apply. However, Movant does not allege that ***his*** trial counsel had a conflict of interest.   Movant is claiming that his counsel was ineffective for failing to identify and raise a conflict of interest objection concerning Amador Garcia's representation of a coconspirator who testified against Movant. There are no facts to suggest, nor does Movant contend, that his trial counsel, Edward F. Garza, labored under a conflict of interest.   Accordingly, Movant's ineffective assistance of counsel claims are reviewed under <u>Strickland</u>.

On December 11, 2006, attorney Amador Garcia was appointed to represent Movant. (D.E. 99).

On January 4, 2007, the Court granted Movant's motion to substitute attorney Douglas Tinker in the place of Amador Garcia.  (D.E. 104, 105).

On April 11, 2007, Mr. Tinker filed a motion to withdraw as counsel (D.E. 148), and on that same day, the second superseding indictment was filed against Movant.  (D.E.149).

On April 23, 2007, the Court granted Doug Tinker's motion to withdraw and ordered that attorney Ed Garza be substituted as counsel of record for Movant.  (D.E. 159).

On May 18, 2007, the Court appointed Amador Garcia to represent Martinez. (D.E. 172).

Movant claims that he "held nothing back" from Amador Garcia while he was his attorney, and that his trial attorney, Ed Garza, was ineffective for failing to object to Amador

18

Garcia's subsequent representation of material witness Carlos Martinez.[6]  However, even if the Court were to assume that Mr. Garza was ineffective for failing to object to Amador Garcia's previous representation of Movant, Movant cannot show he was prejudiced by his lawyer's performance.  That is, Movant fails to establish that, if Mr. Garza had objected to Amador Garcia's appointment, the result of his trial would have been different.  Strickland, 466 U.S. at 692 ("an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.") .

Indeed, in a parallel argument made on appeal, Movant objected to the admission of Martinez' testimony on the grounds that Amador Garcia had initially represented him.  (D.E. 333, United States v. Gutierrez, No. 07-41247 at 3 (5th Cir. Sept. 16, 2008) (unpublished).  The Fifth Circuit noted that Martinez' testimony was certainly unfavorable to Movant as Martinez repeatedly stated that Movant was running shipments along with Martin, and testified to specific drug quantities.  (See Tr 96-107).  However, the Fifth Circuit rejected this claim finding that other evidence established the same facts, and there was no reasonable

---

[6] In the Court's order to the government to respond to Movant's § 2255 petition, the Court noted that "...the United States should also provide an affidavit from Amador Garcia addressing the claim that Garcia's successive representation of Gutierrez and then a government witness at trial, Carlos Martinez, violated [Movant's] Sixth Amendment rights." (D.E. 376).  The government acknowledges that it mistakenly overlooked this instruction, but respectfully argues that the Court need not hear from Mr. Garcia because Movant cannot establish prejudice. (D.E. 388 at 21, n 6).  In his reply to the government's response (D.E. 389), Movant does not argue that an affidavit would assist him in establishing prejudice nor request that the affidavit be ordered.  The Court finds that, because Movant cannot establish prejudice, an affidavit is not necessary on this issue.

probability that the jury would not have found Movant guilty without Martinez' testimony. United States v. Gutierrez, No. 07-41247 at 3. Thus, even if Mr. Garza had objected to Amador Garcia's representation of Movant as a conflict of interest, and Martinez was not permitted to testify, it would not have made a difference in the outcome of the trial. There still would have been sufficient evidence to convict Movant. Movant's first ground of error is denied.

In his second ground, Movant claims that Mr. Garza was ineffective for failing to move for a mistrial after the jury revealed its numerical division during deliberations. (D.E. 375 at 16). Movant cites to a Third Circuit opinion, United States v. Fioravanti, 412 F.2d 407, 416 n. 20 (3d Cir. 1969), for this argument. However, the footnote in Fioravanti simply states that a judge may not *coerce* a jury by *inquiring* about the numerical division. In this case, the mere fact that the numerical division was disclosed in no way equates with a judicial inquiry for purposes of coercing the jury to make its decision. Thus, Fioravanti does not provide a ground to support Movant's ineffective assistance of counsel claim.

Moreover, Movant fails to demonstrate, or even argue, how his attorney's alleged deficiency in not objecting to the jury's revealing its numerical division prejudiced him. Thus, Movant fails to establish "a reasonable probability" that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Thus, Movant's second ground for relief is denied.

**C.    Claim Based on Santos.**

20

Movant's third and final claim is predicated on <u>United States v. Santos</u>, 553 U.S. 507 (2008).  He argues that the jury was not properly instructed on the definition of "proceeds" in regards to his money laundering conviction, and that the jury may have improperly convicted him based on the "criminal receipts."

In <u>Santos</u>, the defendants  were operating a stand-alone illegal gambling operation, and it was this unlawful activity that generated the laundered money.  After their convictions and sentences (on both money laundering and gambling offenses) were affirmed, the defendants filed motions under 28 U.S.C. § 2255.  <u>Santos</u>, 553 U.S. at 2023.  The only challenge the district court found meritorious was a challenge to their laundering convictions based on a later-decided Seventh Circuit decision which held that the term "proceeds" in the federal money-laundering statute applies only to transactions involving criminal profits, not merely criminal receipts.  <u>Id.</u>  Applying that holding, the district court found no evidence that the transactions on which the money-laundering convictions were based involved profits, as opposed to receipts.   Specifically, the evidence showed that the laundered money was used to pay those involved in the gambling operation (runners, winners and collectors).  <u>Id.</u>  The district court therefore vacated the money-laundering convictions, and the Seventh Circuit Court of Appeals affirmed.  <u>Id.</u>

Before the Supreme Court, a plurality of four justices determined that the phrase "proceeds of some form of unlawful activity," found in 18 U.S.C. § 1956(a)(1) was ambiguous.  The rule of lenity, which requires ambiguous terms in criminal statutes to be construed in favor of the defendant, therefore dictated that the term "proceeds" should be

defined as the "profits" of the activity, rather than merely the "receipts."  553 U.S. at 513-14.

According to the plurality opinion, authored by Justice Scalia, adoption of the "receipts"

definition would create a so-called "merger problem," described as follows:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery.  Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955 would "merge" with the money-laundering statute.  Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1).

553 U.S. at 523-24.

As described by the plurality, the money-laundering charges against one defendant

were based on payments to the lottery winners and employees, and the charge against the

other defendant was based on his receipt of payments.  553 U.S. at 524.  Neither type of

transaction could be fairly characterized as involving "profits" and therefore the Seventh

Circuit's decision vacating the defendants' money-laundering convictions was affirmed.  553

U.S. at 524.

Justice Stevens wrote a concurring opinion in Santos that was necessary to forming

a majority.  See United States v. Fernandez, 559 F.3d 303, 316 (5th Cir. 2009) (discussing

the Santos opinion and its precedential implications).  In Justice Stevens' view, Congress

intended "proceeds" to have different meanings in different contexts.  He agreed that in the

context of a stand-alone illegal gambling operation, Congress must have meant "proceeds"

to mean profits, rather than receipts; otherwise, the "merger problem" discussed above would exist.  In other contexts, however, he believed that a merger problem would not exist, and that in those contexts the term "proceeds" could mean "receipts."  <u>Santos</u>, 553 U.S. at 527-28. (Stevens, J. concurring).

The precedential implications of <u>Santos</u> are unclear, given the plurality and Justice Stevens' rationale for joining in the judgment.  Indeed, the opinions in the case itself disagree over those implications.  For example, the plurality opinion espoused the view that the holding of the Court was that the term "proceeds" means "profits"  when there is no legislative history to the contrary.  553 U.S. at 523.  Justice Stevens disagreed, implying instead that his conclusion that "proceeds" means "profits" was limited to the context of an unlicensed stand-alone gambling business, but that, "[i]n other applications of the statute not involving such a perverse result," he would agree with the dissent's view of the Congressional intent as to the term "proceeds."  553 U.S. at 524-528 & n.7 (Stevens, J., concurring).  Additionally, the principal dissent specifically noted that five Justices agreed with Justice Stevens' view that the term "proceeds" includes "gross revenues from the sale of contraband and the operation or organized crime syndicates involving such sales." <u>See</u> 553 U.S. at 531-32 & n.1 (Alito, J., dissenting); <u>see also</u> 553 U.S. at 526, n. 3 (Stevens, J., concurring) ("I cannot agree with the plurality that the rule of lenity must apply to the definition of "proceeds" for [the sale of contraband and the operation of organized crime syndicates involving such sales]").

The Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest ground.'" See Marks v. United States, 430 U.S. 188, 193 (1977) (citation omitted).  As is apparent by the disagreement within the Court itself, however, it is difficult to determine the "narrowest" ground of the Santos case.  Indeed, in light of the foregoing differing opinions by the justices involved in deciding Santos, it is not surprising that lower courts faced with the decision have struggled to determine Santos' precedential value. See, e.g., Brown, supra, 553 F.3d at 783 ("The precedential value of Santos is unclear outside of the narrow factual setting of that case ...).

The Fifth Circuit examined the Santos decision in United States v. Bueno, 585 F.3d 847 (5th Cir. 2009):

> Santos decided that 18 U.S.C. § 1956(a)(1), which bans laundering the "proceeds" of an unlawful activity, requires the government to show that the laundered money is profit, not simply receipts.  128 S. Ct. at 2025.  But Santos addressed an illegal lottery operation.  Id. at 2022.  This case involves a conspiracy to launder proceeds of an illegal narcotics operation, a distinction that makes a difference.  Santos was a splintered decision, with a four-justice plurality headed by Scalia applying the rule of lenity to require showing laundered profits for any violation of § 1956(a)(1). Justice Stevens, whose vote provided the majority, agreed with the plurality's reading concerning gambling operations, but he thought that "proceeds" included all receipts of drug operations.  Id. at 2032 (Stevens, J., concurring).

Bueno, 585 F.3d at 849-50.

In <u>Bueno</u>, the Fifth Circuit concluded that it was not "plain error" when the district court did not require the government to show drug profits as opposed to receipts.  <u>Id.</u>

Thus, it is clear that neither a majority of the Supreme Court, nor the Fifth Circuit, has expressly held that "proceeds" means "profits" in the context of money-laundering charges arising out of illegal drug smuggling.  In the absence of any such binding authority directing this Court to apply <u>Santos</u> to such a case, the Court declines to do so.  Other courts to have addressed the scope of <u>Santos</u> have reached similar conclusions.  <u>See</u>, <u>e.g.</u>, <u>United States v. Demarest</u>, 570 F.3d 1232, 1242 (11th Cir. 2009) (where the funds laundered by the defendant were the proceeds of illegal drug trafficking and not an illegal gambling operation, <u>Santos</u> is inapplicable); <u>United States v. Howard</u>, 2009 WL 205649 *10 (4th Cir.2009) ("Because <u>Santos</u> does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.' "), <u>pet. for cert. filed,</u> (U.S. Apr. 13, 2009) (No. 08-9814); <u>United States v. Fleming</u>, 287 Fed. Appx. 150 (3d Cir.), <u>cert. denied,</u> (2008) (unpublished) (post-<u>Santos</u> decision relying on dissent's statement that "five Justices agree with the position" that "proceeds" includes gross revenues for drug sales and refusing to vacate conviction); <u>Kenemore v. United States</u>, 2008 WL 4965948 *6 (E.D. Tex.2008) ("The inescapable conclusion-considering the respective opinions of Justices Scalia and Stevens regarding *stare decisis*-is that 'proceeds' refers to 'profits' not 'receipts' in money laundering prosecutions involving stand-alone illegal gambling operations."); <u>see</u> <u>also</u> <u>United States v. Prince</u>, 2008 WL 4861296, *7 (W.D. Tenn. September 9, 2008) (unpublished)  (collecting

authority and noting the "varied conclusions" about the applicability of the holding in <u>Santos</u> to cases where the illegal activity is something other than illegal gambling).

In this case, Movant's appeal was decided after <u>Santos</u>, and it is clear from the Fifth Circuit opinion that the proceeds in Movant's case were from illegal drug operations.  <u>See</u> <u>United States v. Gutierrez</u>, No. 07-41247 at 2.  The <u>Santos</u> decision affords Movant no relief. Accordingly, Movant's third ground for relief is overruled.

## V.  CONCLUSION

For the above-stated reasons, Movant's motion under 28 U.S.C. § 2255 (D.E. 375) is DISMISSED WITH PREJUDICE.

Signed this 10th day of February, 2011.

_____
Janis Graham Jack
United States District Judge